Filed 1/15/25  P. v. Cannon CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E083378 |
| v. | (Super.Ct.No. FWV22000008) |
| SEAN T. CANNON, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Ingrid Adamson Uhler, Judge.  Affirmed.

Richard Schwartzberg, under appointment for the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal and Randall D. Einhorn, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury convicted Sean T. Cannon of one count of stalking. (Pen. Code, § 646.9, subd. (a); unlabeled statutory citations refer to the Penal Code.) Cannon argues that the trial court erred by granting his request to represent himself at trial. We affirm.

BACKGROUND

I. *Pretrial*

In November 2022, the People charged Cannon with stalking Ms. Yang.[1] Cannon had retained counsel for his preliminary hearing. The minute order for a pretrial conference in February 2023 states: "Off the record, Court and counsel confer in chambers. [¶] Matter continued; Mental Disorder Diversion work up." The record does not contain a mental disorder diversion workup.

The trial court relieved Cannon's retained counsel in March 2023 and appointed counsel to represent him. In August 2023, Cannon informed the court that he wanted to represent himself. In discussing that request, the court stated: "I guess you have an active case in another state where you have some requirements that would be similar to what your requirements would be here, and it would sort of be a diversion situation. And I think if you were still interested in that, you could still participate in that." The court asked Cannon whether he wanted "to pursue that any further," and he replied that he did not. The court then inquired: "And I understand there was also a misdemeanor offer made to you, which you rejected. You're also rejecting to participate in diversion, which

_____

[1]     At trial, the parties and the court referred to the victim by her last name, Yang. We do the same.

2

would ultimately result in dismissal. [¶] You don't want either of those?" Cannon said that the court's statements were correct and that he wanted to represent himself.

The court gave Cannon an opportunity to review the form for waiver of rights under *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*), and the court then went over each advisement on the form. Cannon stated that he understood each advisement. He also initialed next to each advisement and signed the form. Cannon explained that he had two college degrees, one from Colorado State University and one from the University of Louisiana at Lafayette. According to the *Faretta* form, Cannon had a Bachelor of Science in information technology and Bachelor of Arts in general studies. The court asked him if he knew the penalty for the stalking charge, and Cannon replied that it was "[t]wo years, state prison." The court explained that two years was the middle term, and the upper term was three years. Cannon stated that he understood. The court found that Cannon had knowingly, intelligently, and voluntarily waived the right to counsel, relieved defense counsel, and granted Cannon's request to represent himself.

II.    *Trial*

The case was tried in September 2023. According to Yang's trial testimony, she met Cannon on social media. She was a social media influencer who had 85,000 followers on Instagram and 100,000 followers on TikTok. Cannon began sending her messages when she was 17 years old. She would sometimes respond. She also sold him jewelry, clothing, and other items from her online marketplace. Around June 2021, Yang posted on social media that she wanted to visit Korea, and she complained about the cost

3

of the Covid-related quarantine in Korea.  Cannon had been sending her messages for a few years at that point.  He messaged her and said that he would pay the hotel fees for her two-week quarantine if she met him in person.  She agreed, and they met at a mall, where they spent roughly one hour together.  He paid for her quarantine in Korea.

After they met at the mall, Cannon discovered where Yang lived.  She asked him not to come to her home.  He refused the request and told her that she could not stop him.  He told her that he was "not going to stop until he impregnate[d]" her.  After that, she asked him to stop contacting her, but he continued to do so and sent her more messages that were sexual in nature.  He also showed up at her home, sent gifts to her home, and sent her parents a letter asking for her hand in marriage.  Yang obtained a restraining order against him, but he continued to contact her and appear at her home in violation of the order.  She moved twice to try to get away from him.  When Cannon found out that she had a boyfriend, Cannon emailed the boyfriend and threatened to kill him.

Cannon cross-examined Yang and focused mostly on her stated lack of feelings for him.  For instance, he asked her why she had said that she felt no bond with him.  He also asked her about messages in which he characterized her as his girlfriend after they met at the mall.  Yang admitted that she had "entertained the idea" because he offered to pay for her quarantine, but she did not consider them to be in a relationship.  She also said that she deeply regretted her response and that it did not give him the right to harass her and her family, and she told him soon afterward that she did not want to see him.

Cannon testified in his own defense. He claimed that he and Yang had gone on a date, and she acted flirtatiously and took advantage of him. He visited her house after she obtained the restraining order "to at least give it a shot." He went to her house roughly four times, and he never stayed longer than five minutes. Cannon said that he felt like the victim and that Yang had a tendency to lie or misrepresent herself. He acknowledged that he had "disregard[ed] certain rules," but he did not think that he done anything "explicitly wrong." He never threatened her.

The jury found Cannon guilty of stalking.

III.    *Sentencing*

At the scheduled sentencing hearing, the court ordered a diagnostic study under section 1203.03 "to have a clearer picture as to what type of sentence to impose with all the factors of residency, mental health, the seriousness of the charge, the victim's desires, the prosecution's desires, [and] the probation department's desires." (See § 1203.03, subd. (a) [a defendant convicted of a felony may be temporarily placed in a California Department of Corrections diagnostic facility for the director to report on the defendant's diagnosis and make recommendations regarding disposition of the case].) The court continued the sentencing hearing.

In January 2024, the court sentenced Cannon to the low term of 16 months in state prison. (§§ 18, subd. (a), 646.9, subd. (a).) The court explained that Cannon's mental health and his lack of any prior criminal history were mitigating circumstances

supporting the low term. The record does not contain the diagnostic study, but the court noted that the study recommended a state prison commitment of unspecified length.

DISCUSSION

"'A defendant in a criminal case possesses two constitutional rights with respect to representation that are mutually exclusive. A defendant has the right to be represented by counsel at all critical stages of a criminal prosecution. [Citations.] At the same time, the United States Supreme Court has held that because the Sixth Amendment grants to the accused personally the right to present a defense, a defendant possesses the right to represent himself or herself.'"[2] (*People v. Koontz* (2002) 27 Cal.4th 1041, 1069.)

"If a defendant has validly waived the right to counsel, a trial court must grant a defendant's request for self-representation." (*People v. Mickel* (2016) 2 Cal.5th 181, 205 (*Mickel*).) The "fact or likelihood that an unskilled, self-represented defendant will perform poorly in conducting his or her own defense" does not defeat the right to defend oneself. (*Id.* at p. 206.) The court in *Faretta* "recognized the probability defendants will be ill-served by waiving counsel and relying on their own 'unskilled efforts,' but [the court] nonetheless held the defendant's choice 'must be honored.'" (*Taylor*, *supra*, 47 Cal.4th at p. 866.)

"A two-part inquiry determines whether a defendant may waive the right to counsel: (1) The defendant must be competent to stand trial, and (2) the trial court must

---

[2]  The right to represent oneself derives from the federal Constitution; defendants have no right to self-representation under the California Constitution or state statutory law. (*People v. Taylor* (2009) 47 Cal.4th 850, 871-872 & fn. 8 (*Taylor*).)

6

'satisfy itself' that the waiver of 'constitutional rights is knowing and voluntary.'"

(*People v. Waldon* (2023) 14 Cal.5th 288, 307 (*Waldon*).)

The "right of self-representation is not absolute." (*Indiana v. Edwards* (2008) 554 U.S. 164, 171.) The federal Constitution requires that the defendant be competent to stand trial, and there is no higher standard of competence for waiving counsel. (*People v. Johnson* (2012) 53 Cal.4th 519, 531 (*Johnson*).) But the Constitution permits states to impose a higher standard of competence for exercising the right to self-representation. (*Edwards*, at pp. 177-178.) Accordingly, the California Supreme Court held in *Johnson* that the trial court has discretion to deny self-representation if the defendant is competent to stand trial but "suffers from a severe mental illness to the point where he or she cannot carry out the basic tasks needed to present the defense without the help of counsel." (*Johnson*, at p. 530; accord, *Edwards*, at p. 178.)

The trial "court need not routinely inquire into the mental competence of a defendant seeking self-representation. It needs to do so only if it is considering denying self-representation due to doubts about the defendant's mental competence. When a court doubts a defendant's competence to stand trial, it 'shall appoint a psychiatrist or licensed psychologist, and any other expert the court may deem appropriate, to examine the defendant.' [Citation.] Similarly, when it doubts the defendant's mental competence for self-representation, it may order a psychological or psychiatric examination to inquire into *that* question." (*Johnson*, *supra*, 53 Cal.4th at p. 530.) The court should apply the heightened competence standard "cautiously." (*Id.* at p. 531.) "Criminal defendants still

7

generally have a Sixth Amendment right to represent themselves. Self-representation by defendants who wish it and validly waive counsel remains the norm and may not be denied lightly." (*Ibid.*)

Cannon concedes that he was competent to stand trial. He also concedes that "the trial court complied with the four corners of *Faretta*." He nevertheless argues that although he was competent to stand trial, he was not competent to represent himself, so the court erred by finding otherwise and should have denied his request to represent himself. The argument lacks merit.

In order to grant the request for self-representation, the court was required to find only that Cannon was competent to stand trial. That implied finding of competence was necessary for the court to conclude that Cannon had validly waived the right to counsel. (*Waldon*, *supra*, 14 Cal.5th at p. 307.) But the court made no finding about Cannon's competence beyond that. We only imply findings that are necessary to support the court's order (*People v. Francis* (2002) 98 Cal.App.4th 873, 878), and *Johnson* does not require the court to make any further competence findings to *grant* a request for self-representation. Rather, if the court wants to exercise its "discretion to deny self-representation," then it must find that the defendant suffers from a severe mental illness that makes them unable to carry out the basic tasks of a defense. (*Johnson*, *supra*, 53 Cal.4th at p. 530.) Thus, Cannon's claim that the court erred by "finding that [he] was competent to represent himself at trial" does not accurately describe the court's ruling. The court did not make that finding and was not required to make it.

8

To the extent that Cannon is challenging the court's failure to find that he suffered from a severe mental illness preventing him from carrying out the basic tasks of a defense, the argument is unavailing. To prevail on that challenge, Cannon must show that the evidence compelled the finding as a matter of law, that is, that the evidence "'was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding."'" (*In re Raul V.* (2022) 82 Cal.App.5th 290, 301.)

Cannon does not attempt to make the required showing. He instead analogizes to *Johnson* and asserts that "the very same psychological information" existed in this case. But *Johnson* is materially distinguishable. The trial court in that case revoked the defendant's pro per status after he had represented himself for months, finding that he was competent to stand trial but not competent to conduct trial proceedings himself. (*Johnson*, *supra*, 53 Cal.4th at p. 525.) The evidence that the defendant suffered from a severe mental illness included a psychologist's testimony at the trial competency hearing; the psychologist opined that there was a "'strong possibility' that [the] defendant had some type of delusional thought disorder coupled with conspiracy paranoia," and "it was 'more likely than not' that [the] defendant was not competent" to stand trial. (*Id.* at pp. 524, 532.) In addition, during the roughly seven months when the defendant represented himself, he filed "a number of nonsensical motions and conducted himself in a bizarre and disruptive manner." (*Id.* at p. 532.) For instance, one nonsensical filing was "a handwritten document containing a bizarre caption and addressed to the

9

'Executive Office for Claims.'" (*Id.* at p. 533, fn. 2.) The first few sentences of the document stated: "'Efficient proffessional Salutations. As to the chief unparallel tainted tailspin exploition, incomplete concord tactical operation submission of facts. In rapid ex-parte pressing arrangement, with a bust of counterfeit ring.'" (*Ibid.*) Similar examples of bizarre filings "abound[ed]." (*Id.* at p. 533.) On that record, our Supreme Court concluded that substantial evidence supported the finding that the defendant was not competent to represent himself, and the trial court did not abuse its discretion by revoking the defendant's pro per status. (*Id.* at pp. 531-532.)

The evidence in this case is not remotely similar. Cannon did not exhibit similarly bizarre or nonsensical behavior, nor was there evidence that he was disruptive. Cannon asserts that he was obsessed with Yang, and that obsession "was significant enough that the court would have diverted [him] to mental health diversion had he consented." The court's apparent offer to consider mental health diversion is not evidence. The record contains some reference to a mental disorder diversion workup, but no such workup appears in the record. And if Cannon was in a diversion program in another state, the record contains no information about that program, its eligibility requirements, or the evidence that supported his entry into that program.

Cannon also cites the court's order for a diagnostic study under section 1203.03 as evidence that the court was "bothered" by his mental state. That diagnostic study also does not appear in the record. Moreover, the court ordered the study for purposes of sentencing, long after it ruled on Cannon's pretrial request to represent himself. For

10

evidence to raise a doubt about a person's competence, "we must be able to reasonably conclude that the evidence was in fact part of the record presented or otherwise made available to the trial court.  [Citation.]  We do not require a trial court to evaluate a defendant's competence based on evidence not before it at the time of its decision." (*Mickel*, *supra*, 2 Cal.5th at p. 197.)  Thus, regardless of the conclusions in the diagnostic study, the study would not show that the court erred—it was not before the court when it ruled on Cannon's request to represent himself.  In short, there was no evidence from a medical professional indicating that Cannon had a mental illness, let alone a severe one. The record did not compel a finding as a matter of law that Canon suffered from a severe mental illness preventing him from carrying out the basic tasks of a defense.

For all of these reasons, Cannon fails to show that the court erred by granting his request to represent himself.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ
J.

We concur:

RAMIREZ
P. J.

MILLER
J.

11